IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

**FILED**

MAR 23 2017

Clerk, U.S. District Court
District of Montana
Missoula

DUANE RONALD BELANUS,

Plaintiff,

vs.

SHERIFF LEO DUTTON, et al.,

Defendants.

CV 12-00065-H-DLC

ORDER

Defendants filed a motion for summary judgment seeking judgment on all claims in their favor. (Doc. 76.) Plaintiff Duane Belanus opposes the motion and has filed the following motions: Motion for Protective Order (Doc. 70); Motion for Sanctions (Doc. 81); Motions to Compel (Doc. 83, 100); Motions for Adverse Jury Instructions (Docs. 85, 87, 89); Motion for Contempt or to Comply Compliance (Doc. 101); and Motion for Declaratory Judgment (Doc. 114).

Defendants' Motion for Summary Judgment (Doc. 76) will be granted as to Count VI (failure to train corporal), Count VII (failure to train corporal), Count VIII (failure to train corporal), Count XII (failure to investigate), and Count XIV (denial of medical care). Defendants Grimmis, Shanks, and Gilbertson will be dismissed. The motion for summary judgment will be denied as to all other claims and Defendants.

1

Mr. Belanus's motions will be denied, except his motion to comply which will be granted in part and denied in part.

## I. MOTION FOR SUMMARY JUDGMENT

### A. Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the

non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. Moreover, "[a]

plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 447 U.S. at 248.

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). But it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

Rule 56(d) of the Federal Rules of Civil Procedure provides:

4

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or
(3) issue any other appropriate order.

To prevail on a Rule 56(d) request, a party must make "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists." *Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (9th Cir. 2004) (citation omitted). "The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." *Id.* at 1129-30 (citation omitted). A district court may "deny[ ] further discovery if the movant has failed diligently to pursue discovery in the past, or if the movant fails to show how the information sought would preclude summary judgment." *Id.* at 1130 (citation omitted).

By notice provided July 22, 2016 (Doc. 79), Mr. Belanus was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

5

## B. Facts[1]

On August 3, 2008, Mr. Belanus was arrested and charged with kidnaping, rape, inflicting bodily injury during a rape, tampering with evidence of the rape, burglary, and theft. *State v. Belanus*, 357 Mont. 463, 240 P.3d 1021 (Mont. 2010). He was convicted of these charges on June 12, 2009. (Statement of Undisputed Facts ("SUF"), Doc. 78 at ¶ 4.) He was incarcerated at the Lewis and Clark County Detention Center ("LCDC") from August 3, 2008 until August 13, 2009. (Complaint, Doc. 1 at 9.)

Upon entry into LCDC, Mr. Belanus was placed in Pod 6 with other inmates with similar charges. (Complaint, Doc. 1 at 9; Statement of Disputed Facts ("SDF"), Doc. 105 at 115.) Pod 6 is a general population unit at LCDC which has been used to segregate inmates although it is not designated as such. (SUF at ¶ 3.) Mr. Belanus was housed in Pod 6 from August 4, 2008 until September 30, 2008 when he was moved to the library floor because Pod 5 at the jail was over crowded. He was moved back to Pod 6 on October 7, 2008 but had to go back to the library on October 17, 2008 again due to overcrowding of the women's pod. He was returned to Pod 6 on October 21, 2008 but was moved to Pod 1 on

---

[1]The Court has considered the facts in the light most favorable to Mr. Belanus. *Walls*, 653 F.3d at 966.

November 24, 2008. He was returned to the library again on November 27, 2008 and returned to Pod 6 on November 29, 2008 where he remained until February 3, 2009 when he was moved to Pod 1 where he was housed until the incident at issue occurred on July 11, 2009. (Movement Sheet, Doc. 78-3.)

On or about May 18, 2009, another inmate, Daniel Hartford, was attacked in Pod 6 because he was a sex offender. Two inmates were charged with assault as a result of this incident. (Doc. 105-15 at 1-14.)

While Mr. Belanus was housed in Pod 1, Inmate Travis Demichelis was housed in Pod 2 and regularly harassed and threatened Mr. Belanus through the glass between pods. Inmate Demichelis would yell profanities and get others involved with his taunts and threats of injury. Mr. Belanus contends that rumors quickly spread around LCDC that he was in jail for a sex-crime.

On the evening of July 11, 2009, Officer Becky Hawthorne arrived at Pod 1 to escort Mr. Belanus from Pod 1 to the nurses' station. (SUF at ¶ 5, SDF 5, Doc. 105 at 117.) During the medication pass, Mr. Belanus told Officer Hawthorne that "a girlfriend of someone in Pod 2 had called the jail and found out why he was here." (SUF at ¶ 37.) While at the nurses' station, Mr. Belanus told Officer Hawthorne, Officer Brian Merritt, and two other LCDC employees that the LCDC staff member who had been at his criminal trial had been talking with inmates in

Pods 2, 3, and 4 for an extended period of time and after that Mr. Belanus started receiving threats from those pods.[2] Mr. Belanus told the officers he had been receiving threats of harm and death, other inmates shouted derogatory names at him and notes were being passed between pods about him. He also explained that Brian Olson and Nick England (other inmates in Pod 1 with Mr. Belanus) came into his cell and starting making comments about his alleged charges. He stated he was afraid to return to his pod because everyone had distanced themselves from him and Olson and England were acting noticeably different and hateful toward him. (SDF, Doc. 105 at 148-150.) In response to his concerns Officer Hawthorne told him "If something was going to happen, it would've happened by now. You're going back to the pod." (Doc. 105 at 86.)

Mr. Belanus contends that while Officer Hawthorne was taking Mr. Belanus to and from the nurses' station, at least four inmates from Pod 2 were yelling, threatening, and laughing at Mr. Belanus. In addition, inmates from Pods 3 and 4 were hitting the windows and doors while yelling obscenities. (Doc. 105 at 125-126.) Officer Hawthorne admits that as she and Mr. Belanus were passing the door to Pod 2, Demichelis was standing by the Pod 2 door, yelling threats at Mr.

_____

[2]An unsigned handwritten note apparently written by another inmates was found in Pod 2 and stated: "we set [sic] in here with one of the Corprals [sic] for at least 40 minuts [sic] talking about it two days ago." (SUF at ¶ 36.)

Belanus. Officer Hawthorne responded by telling Demichelis to be quiet and move away from the door. (SUF at ¶ 11.) Officer Hawthorne was aware that the doors to Pod 1 and Pod 2 were both locked and Demichelis did not have physical access to Mr. Belanus. (SUF at ¶ 12.)

On the way back to Pod 1, Officer Hawthorne told Mr. Belanus to remain in his cell if he feared for his safety and she would deal with the situation after medication pass. (SUF at ¶ 10; SDF, Doc. 105 at 131 ¶ 17.) Officer Hawthorne contends she also told Mr. Belanus to lock himself in his cell. (SUF at ¶ 9.) Individual cell doors in LCDC pods lock automatically when closed. Once locked, they can only be opened by the control officer or by a detention officer with a key. Detainees can communicate with the control officer by way of an intercom located in the cell. (SUF at ¶ 14.) Detainees at LCDC are allowed to lock themselves in their own cells during hours when general lockdown is not in effect, and frequently do so. (SUF at ¶ 15.)

Mr. Belanus claims he could not lockdown in his cell because he had been ordered to keep his cell door open so inmates housed on the floor could use the bathroom. (Doc. 105 at 89, 129.) Captain Grimmis confirms that while inmates generally have the freedom to lock their individual cell doors, there is an exception that, during lockdown, one cell door in the pod may need to be left open

to allow inmates housed on the floor to use the toilet. (Grimmis Aff., Doc. 78-17 at 2, ¶ 5.)

Mr. Belanus did not lockdown in his cell when he returned from the nurses' station. Instead, he called his parents and his pastor from a phone in the common area of Pod 1 and then went to his cell but left the door unlocked. (SUF at ¶ 18.)

At approximately 10:30 p.m., Inmates Olson and England went into Mr. Belanus's cell and assaulted him. (SUF at ¶ 19, Merritt Report Narrative, Doc. 78-8 at 1.) The assault eventually moved from Mr. Belanus's cell to the common area where it was observed by Officer Merritt, the control officer on duty that evening. (SUF at ¶ 20.) Mr. Belanus alleges the assault lasted until 10:36 when LCDC staff arrived to stop the assault.

Officer Merritt alerted Officer Hawthorne about the fight and Officer Hawthorne and another LCDC employee responded to Pod 1 to intervene. The detention officers separated Inmate Olson and Mr. Belanus. Officer Hawthorne took Mr. Belanus to his cell while the other officers restrained Inmate Olson. (SUF at ¶ 22.) Adam Shanks and another police officer arrived to assist. They left once the fight was broken up. (SUF at ¶ 23.)

According to a LCDC report narrative (Doc. 78-8 at 1), the assault occurred at 10:34 p.m.. EMTs arrived at 10:44 p.m. At 10:50 p.m., Mr. Belanus was

escorted from Pod 1 to booking and housed in the PC cell and evaluated by paramedics. The EMTs determined Mr. Belanus's injuries were not life threatening and did not require them to transport him to the hospital. (SUF ¶ 24; SDF ¶ 24, Doc. 105 at 135-136.) The EMTs left LCDC at 11:02 p.m. but returned to LCDC at 12:54 a.m. to reevaluate Mr. Belanus. They determined from their second quick assessment that Mr. Belanus's injuries were not life threatening and did not require them to transport Mr. Belanus to the hospital. The ambulance left LCDC at 1:03 a.m. Due to Mr. Belanus's continued complaints of severe pain, Deputy Vance Lavender transported Mr. Belanus to the hospital. (Merritt Report, Doc. 78-8; SDF, Doc. 105 at 136-137.)

St. Peter's Hospital staff diagnosed Mr. Belanus with a "mild kidney contusion" and a "laceration of his lower lip, 2 cm in total length repaired with a single layer of Vicryl sutures." (Emergency Room Note, Doc. 78-10 at 2.) Mr. Belanus returned to LCDC at 5:44 a.m. (Merritt Report, Doc. 78-8 at 2.)

Although Inmates Olson, England, and Demichelis were held jointly and severely liable for Mr. Belanus's medical costs resulting from the assault (SUF at ¶ 28), Mr. Belanus has received collection notices for the medical costs resulting from the assault (Doc. 105 at 139, ¶ 29). As part of his criminal conviction, Mr. Belanus was ordered to pay $4,070.72 restitution for the medical costs he incurred

while he was incarcerated that were not the result of the actions of other inmates. (Doc. 78-5 at 4.)

## C. Allegations

The remaining Defendants in this action are Sheriff Leo Dutton, Lewis & Clark County, Captain Jason Grimmis, D.O. Becky Hawthorne, D.O. Brian Merritt, Sgt. Laurel Bulson, Sgt. Clair Swain, Sgt. Scott Ferguson, Sgt. Timothy West, Sgt. Eric Gilbertson, and Officer Adam Shanks.

Liberally construed, Mr. Belanus alleges Defendants Dutton, West, Swain, Bulson, Ferguson, and Lewis and Clark County failed to protect him from other inmates when they placed him in a general population cell as a result of overcrowding at LCDC. (Amd. Cmplt, Doc. 5, Counts I, II, IV.)

He also claims Defendants Dutton, West, Bulson, Ferguson, and Swain failed to train and/or supervise the unnamed corporal who allegedly disclosed the details of Mr. Belanus's criminal trial to other inmates. (Amd. Cmplt, Doc. 5, Counts VI, VII, VIII, Doc. 5 at 12-14.)

Mr. Belanus alleges Defendants Hawthorne, Shanks, Gilbertson, and Merritt failed to protect him on July 11, 2009 when they put him back on Pod 1 despite him telling them he believed he would be assaulted. (Amd. Cmplt., Count IX, Doc. 5 at 15.) He alleges Defendants Ferguson, Bulson, Swain, West, and Dutton

12

failed to train and supervise these Defendants and failed to implement procedures to avoid the assault. (Amd. Cmplt., Counts X, XI, Doc. 5 at 16-17.)

Mr. Belanus also claims that Defendant Grimmis minimized his injuries and failed to record "oral confessions." (Amd. Cmplt., Count XII, Doc. 5 at 18.)

In his last claim, Mr. Belanus alleges Lewis and Clark County was deliberately indifferent to his serious medical needs because they have a practice of ignoring medical needs for several hours to keep medical costs down. (Amd. Cmplt., Count XIV, Doc. 5 at 20.)

The City of Helena and the State of Montana were dismissed from this action on January 12, 2015. (Doc. 4.) As such, Counts III, XV, XVIII and XIX which were only brought against these Defendants will not be addressed. Similarly, the Court will not address claims raised against unnamed defendants. Those individuals have never been identified, they have not been served, and they are not parties to this action. These include Counts V, XIII and XVI.

### D. Analysis

Mr. Belanus, at the time of the assault, had been convicted but had not yet been sentenced. In *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000), the Ninth Circuit held that a convicted but unsentenced prisoner should be treated as a sentenced inmate and not a pretrial detainee. Accordingly, Mr. Belanus's

allegations are properly considered under the Eighth Amendment standard, rather than the Fourteenth Amendment, which applies to pretrial detainees. *See Bell v. Wolfish*, 441 U.S. 520 (1979).

The Court will first address the individual liability claims, then the supervisory liability claims, and finally the municipal liability claims brought against Lewis and Clark County.

### 1. Individual Liability

#### a. Failure to Protect

Prison officials have a duty under the Eighth Amendment to protect prisoners from violence at the hands of other prisoners because being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society. *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (quotation marks omitted); *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir.2005).

The failure of a prison official to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only when two requirements are met: (1) the objective component—the deprivation alleged must be sufficiently serious, and (2) the subjective component—the prison official must possess a sufficiently culpable

state of mind. *Farmer*, 511 U.S. at 834 (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991). For a failure to protect claim, the "sufficiently serious" requirement is satisfied by showing the existence of "conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993). "The objective question of whether a prison officer's actions have exposed an inmate to a substantial risk of serious harm is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075–76 (9th Cir. 2013) (citation omitted).

To meet the subjective component, a prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *See Farmer*, 511 U.S. at 834. A prison official can be held liable under the Eighth Amendment for failing to guarantee the safety of a prisoner if they know of and disregard an excessive risk to an inmate's health or safety. *See Farmer*, 511 U.S. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.* Deliberate indifference describes a state of mind more blameworthy than negligence. *See Farmer*, 511 U.S. at 835 (*citing Estelle*, 429 U.S. at 104). Neither negligence nor gross negligence will constitute deliberate

indifference. *See Farmer*, 511 U.S. at 835–36 & n. 4; *see also Estelle*, 429 U.S. at 106 (establishing that deliberate indifference requires more than negligence).

Deliberate indifference can be established by demonstrating that a defendant disregarded evidence of a specific threat to the plaintiff or if the plaintiff was assaulted as a result of prison conditions or practices that are dangerous to all prisoners or to any identifiable groups of prisoners. As set forth in *Farmer*,

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to his future health and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

*Framer*, 511 U.S. at 843. To prove knowledge of the risk, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. *Farmer*, 511 U.S. at 842.

In light of the information which Mr. Belanus claims he provided to Officers Merritt and Hawthorne, there is a genuine issue of material fact whether they were deliberately indifferent to Mr. Belanus's safety. Assuming the facts in the light most favorable to Mr. Belanus, he told Officers Hawthorne and Merritt that the LCDC staff member who had been at his criminal trial had been talking with inmates in other pods and after that he started receiving threats from those

pods, that he had received threats of harm and death, that inmates shouted derogatory names at him, and that inmates were passing notes about him. He told them that Inmates in his housing Pod, Olson and England, came into his cell that day and starting making comments about his charges. Lastly, he explained to them how afraid he was to return to his pod because everyone had distanced themselves from him and his future attackers were acting noticeably different and hateful toward him. (SDF, Doc. 105 at 148-150.)

Although Officer Hawthorne testified she told Mr. Belanus to lock down, Mr. Belanus disputes this statement. He contends Officer Hawthorne only told him to remain in his cell but he could not lock down because he was required to keep his cell door open to allow inmates housed on the floor to use the bathroom. He raised this allegation in his Amended Complaint (Doc. 5 at 26) and it was not disputed by Defendants. Thus, there is an issue of fact regarding whether Mr. Belanus was told to lockdown and whether he was allowed to lock down in light of the alleged requirement that he keep his cell door open. Defendants argue that "any reasonable person in Belanus's position – and in Defendant Hawthorne's position – would have interpreted [Hawthorne's] comments as instructions to Belanus to lock himself in his cell until Defendant Hawthorne could assess the threat against him." (Doc. 112 at 3.) But this is an issue of fact that must be

decided by a jury.

Defendants argue that the fact that Officer Hawthorne said "If something was going to happen, it would've happened already" demonstrates that Officer Hawthorne did not appreciate the risk. But again, given the information that Mr. Belanus says he conveyed to the officers, putting Mr. Belanus back on the pod assuming he could not lock himself in his cell for protection raises a question of fact whether Officers Hawthorne and Merritt were deliberately indifferent.

Construing the facts in the light most favorable to Mr. Belanus, there is a genuine issue of material fact regarding whether Defendants Hawthorne and Merritt were aware of a specific threat to Mr. Belanus's safety and whether they took sufficient precautions to protect him. The Court rejects Defendants' contention that they are protected by qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It was clearly established in July 2009 that a prison official's failure to respond to known, credible threats to an inmate's safety constitute a violation of the inmate's Eighth Amendment rights. *See Farmer*, 511 U.S. 825; *Chandler v. Williams,* 2013 WL 2489139 (D.Or 2013);

*Rodriguez v. Sect'y for Dep't of Corr.*, 508 F3d 611, 617 n12 (11th Cir. 2007) (gang-related threats explicitly reported to prison officials presented a substantial enough risk of harm to trigger an Eighth Amendment duty to act); *Odom v. S. Carolina Dep't of Corr.*, 349 F3d 765, 770 (4th Cir. 2003) (inmate-on-inmate assault resulting in significant physical injury, preceded by reported death threats, was sufficiently substantial for Eighth Amendment purposes); *Miller v. Kastelic*, 601 Fed.Appx. 660 (10th Cir. 2015); *Schofield v. Hopkins*, 491 Fed.Appx. 772, 774 (8th Cir. 2012) (finding that inmate sufficiently stated a failure to protect claim against officer who managed the laundry department because other inmate's threat to harm the plaintiff had been reported to the officer); *Young v. Selk*, 508 F.3d 868, 870–73 (8th Cir. 2007) (discussing potential for substantial risk where inmate told officials of cellmate's threats, requested to be removed from cell immediately, said it was an emergency, and was subsequently attacked).

Mr. Belanus has not however, presented sufficient evidence that Defendants Shanks or Gilbertson violated his Eighth Amendment rights. Adam Shanks is a Police Officer with the Helena Police Department. He is not an employee of Lewis and Clark County and has no supervisory or policy making authority. He responded when he was notified of the assault but was only on the scene for ten minutes following the incident. He did not speak to any inmates about the assault.

19

(SUF at ¶ 38.) Mr. Belanus does not dispute this evidence. There is no basis for liability against Officer Shanks.

There is no evidence that Sgt. Eric Gilbertson was at the medical station when Mr. Belanus expressed concerns for his safety. The only evidence of Sgt. Gilbertson's involvement is an arrest report which indicates that he was involved in holding Inmate Olson down after the incident and that he escorted Mr. Belanus out of Pod 1 after the assault. (Doc. 1-1 at 3.) There is no evidence of deliberate indifference on the part of Sgt. Gilbertson and he will be dismissed.

### b. Failure to Investigate

Mr. Belanus alleges Captain Grimmis violated his rights under the Fourteenth Amendment due process clause and the equal protection clause. (Doc. 104 at 49-50). Specifically, he alleges Captain Grimmis minimized his injuries, failed to properly investigate the incident, and failed to record "oral confessions." (Amd. Cmplt., Count XII, Doc. 5 at 18.) Defendants contend the evidence was not maintained after criminal convictions were obtained for the inmates responsible for the assault. Mr. Belanus seeks to hold Captain Grimmis liable because LCDC staff members were not held criminally responsible because of Captain Grimmis's concealment and destruction of evidence. (Doc. 105 at 54-56.)

Mr. Belanus's allegations do not state a constitutional violation. The Ninth

Circuit has made clear that there is no right to an adequate investigation claim under § 1983, unless it is anchored to a separate constitutional right. *Gomez v. Whitney*, 757 F.2d 1005, 1006 (9th Cir. 1985) ("[W]e can find no instance where the courts have recognized inadequate investigation as sufficient to state a civil rights claim unless there was another recognized constitutional right involved."); *see also Ogurinu v. City of Riverside*, 79 Fed.Appx. 961, 962-63 (9th Cir. 2003) ("An inadequate investigation alone does not involve the deprivation of a protected right, but must involve another recognized constitutional right" (internal quotation marks and citations omitted)). This is because "the guarantee of due process under the Fourteenth Amendment applies only when a constitutionally protected liberty or property interest is at stake." *Ingraham v. Wright*, 430 U.S. 651, 672 (1977); *Erickson v. United States*, 67 F.3d 858, 861 (9th Cir. 1995). The Ninth Circuit has made clear that a right to an adequate investigation is not a constitutionally protected liberty or property interest. *See Gomez*, 572 F.2d at 1006; *Ogurinu*, 79 Fed.Appx. at 962-63.

This claim fails as a matter of law and summary judgment will be granted to Captain Grimmis.

### 2. Supervisory Liability

Mr. Belanus alleges Defendants Dutton, West, Swain, Bulson, and Ferguson

were deliberately indifferent to his safety by housing him, a sex offender, in a general population pod without taking other precautions other than telling him to not talk about his charges. (Amd. Cmplt., Doc. 5, Counts I, II.) He also alleges these Defendants failed to train and/or supervise the unnamed corporal who allegedly disclosed the details of his criminal charges and failed to train Officers Merritt and Hawthorne for returning him to Pod 1 after being advised that he was in danger. (Amd. Cmplt., Doc. 5, Counts VI, VII, VIII, X, XI.)

"[S]upervisors are not subject to vicarious liability, but are liable only for their own conduct." *Bergquist v. County of Cochise*, 806 F.2d 1364, 1369 (9th Cir. 1986). To hold a supervisory official liable under § 1983, the plaintiff must show either: (1) personal participation in the constitutional deprivation; or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Jeffers v. Gomez*, 267 F3d 895, 915 (9th Cir. 2001); *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991).

The supervisor's "personal participation" may include his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)(internal citations,

quotation marks, and alterations omitted). A "sufficient causal connection" exists if the supervisor "implement[ed] a policy so deficient that the policy 'itself is a repudiation of constitutional rights.'" *Redman*, 942 F.2d at 1454–55 (citations omitted.). However, a supervisor's "general responsibility for supervising the operations of a prison is insufficient to establish personal involvement." *Id.* at 1455 (citation omitted).

### a. Placement in General Population

Just because Mr. Belanus is a sex offender does not automatically mean that he faced a substantial risk of serious harm when he was housed in general population. There are many factors that can be considered to determine if a prisoner may be vulnerable to attack, and where the prisoner has been charged/convicted of a sex offense certainly is one factor. Other factors which maybe relevant to the determination of whether Mr. Belanus, a convicted sex offender, faced a substantial risk of harm when he was placed in general population include but are not limited to whether there were prior attacks against sex offenders, whether Mr. Belanus was housed with aggressive or violent offenders, the level of supervision in Pod 1, whether Mr. Belanus was allowed to lock himself down to protect himself, and how long he had been housed in Pod 1 without incident.

There is a genuine issue of material fact regarding whether the jail was segregating sex offenders for their safety. There is undisputed evidence that except for three days in which he was placed in Pod 1 in November, 2008, Mr. Belanus was segregated either in Pod 6 or in the library from August 4, 2008, when he arrived at LCDC, until February 3, 2009, when he was moved to the general population in Pod 1. (Movement Sheet, Doc. 78-3.) Mr. Belanus posits that he was segregated due to his charges, a fact which is not disputed by Defendants.

Defendants admit Pod 6 is a general population unit that has been used to segregate inmates but they contend that it is not designated as such. (SUF ¶ 3.) Mr. Belanus asserts that Pod 6 was used to house inmates with similar crimes. Defendants do not dispute this representation. He also submitted affidavits from another inmate stating that while he was housed in LCDC, individuals with disliked crimes were not housed in general population. (Jensen Aff., Doc. 1015-12 at 7-8.) The evidence suggests that the jail recognized it was necessary to segregate inmates charged and/or convicted of sex crimes.

Defendants provide no reasonable justification for moving Mr. Belanus, who had been previously segregated, to the general population in Pod 1. The movement sheet lists Officer Hawthorne in connection with this move but it is

unclear whether she was solely responsible for the decision to move Mr. Belanus or if she was acting on someone else's orders. In addition, no reason is given for the move on the movement sheet. Mr. Belanus alleges he was the only individual with a "disliked crime" who was housed in general population when there was a pod specifically designated to house those with similar charges. (Doc. 105 at 48.)

Mr. Belanus contends he was moved because of overcrowding. Defendants admit Mr. Belanus was moved from Pod 6 to Pod 1 when the women's unit needed additional space. But they argue that this was a "legitimate administrative necessity of the LCDC [that] cannot be restricted by the personal beliefs of inmates." (MSJ brief, Doc. 77 at 26 citing *Chandler v. Williams*, 2013 WL 2489139, *20 (D.Or June 7, 2013).) Jail officials certainly have the discretion to move inmates to different areas of the facility but if an inmate was segregated for a particular reason and then moved into general population due to overcrowding without any precautions, it raises a genuine issue of material fact whether this was done in deliberate indifference to his safety.

Mr. Belanus presented evidence that just two months prior to his assault another inmate was assaulted at LCDC for being a sex offender, albeit in the segregated pod. (Hartford reports, Doc. 105-15.) Mr. Belanus also contends he informed Sgts. West, Ferguson, Bulson, and Swain that he was in fear of being in

general population after watching an individual he was housed with in Pod 6 and on the floor in the library placed in general population where he was severely beaten and stomped into the concrete floor by several inmates because of his charges. He contends the sergeants told him not to talk about his charges, lie about his charges if necessary, tell the other inmates that he didn't have his paperwork, and to not worry because what occurred in Pod 4 would not happen in Pod 1. (Doc. 105 at 8-9.)

In addition, Mr. Belanus requested in discovery documents regarding other assaults, but Defendants objected to that request because it was over broad in that it sought all documents regarding "any type of assaults, fights, incidents, and segregation at the Lewis and Clark Detention Center from August 3rd (sic), 2007 until the date of this request" which was April 11, 2016. Requiring Defendants to produce nearly ten years of disciplinary records for LCDC is clearly overly burdensome and will not be compelled. However, evidence of other assaults/incidents involving vulnerable inmates charged with sex crimes is relevant and Defendants will be required to respond to this request as set forth below. The Court cannot determine whether Mr. Belanus faced a substantial risk of serious harm until this discovery issue is resolved. *See Chandler v. Amsberry*, 2014 WL 1323048 (D.Or. 2014)(evidence which "shows that there were

infrequent assaults in general population areas and that those assaults were generally not a result of an inmate's status as a sex offender" was relevant to the finding that prison officials were not sufficiently aware of facts giving rise to an inference of the serious risk of harm.)

A reasonable response is evaluated by considering whether the defendants considered the safety of other inmates, whether the official took preventive measures to protect the inmate, and whether less dangerous alternatives were in fact available. *Berg v. Kincheloe*, 794 F.2d 457, 462 (9th Cir. 1986). Defendants presented no evidence indicating that they considered Mr. Belanus's safety before placing him in general population or whether they took any preventive measures to protect him.

Two factors weaken Mr. Belanus's position but are an insufficient basis upon which to grant summary judgment. First, Mr. Belanus provided no evidence regarding the other inmates housed with him in Pod 1. A plaintiff could potentially establish a substantial risk of serious harm where vulnerable prisoners and aggressive prisoners are placed together, unsupervised and unpatrolled. *See, e.g., Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76 (6th Cir. 1995). But Mr. Belanus provided no information on what type of inmates were housed with him in Pod 1. He sought discovery on the names of these individuals but specifically indicated

that the list of detainees was to be provided without the individual's charges or past criminal history. (Doc. 95-2 at 2.) That information would have been relevant to the determination of whether Mr. Belanus faced a substantial risk of serious harm when he was placed in Pod 1, but he has not and presumably cannot provide that information.

Additionally, Mr. Belanus made no argument and presented no evidence to suggest that he was the victim of any other incidents of violence while housed in Pod 1. He had been housed there for more than five months presumably without incident. This may have prompted Officer Hawthorne's comment that if it hasn't happened by now it won't happen.

Nevertheless, considering the evidence in the light most favorable to Mr. Belanus, he had been previously segregated but was then moved to a general population pod due to overcrowding. Despite this move, there is no evidence that precautions were taken for Mr. Belanus's safety. In fact, he was initially housed on the floor in Pod 1 and then when he was moved to a cell he was instructed he had to leave his cell door open. There is evidence of at least one recent assault on a sex offender and there may be more. However, resolution of that issue requires further discovery. As such, the Court finds there is a genuine issue of material fact, at least at this time, regarding whether Mr. Belanus faced a substantial risk of

serious harm when he was placed in Pod 1.

Defendants argue that they are entitled to qualified immunity on Counts I, II, and IV-XI because in response to Mr. Belanus's concerns and Inmate Demichelis's threats Officer Hawthorne brought Mr. Belanus back to Pod 1 where she contends he had the ability to lock his cell and contact a detention officer and because she said she would deal with the situation directly after medication rounds. As set forth above, because the Court finds there is a genuine issue of material fact regarding whether Mr. Belanus was allowed to lock his cell thus there is an issue of fact whether Defendants Merritt and Hawthorne were deliberately indifferent to his safety. They also argue that Mr. Belanus failed to provide evidence that better alternatives existed or that Defendants failed to implement them. But Defendants have the burden and provided no evidence that they took any preventive measures to protect Mr. Belanus. Taking the evidence in the light most favorable to Mr. Belanus, Defendants placed him in a general population cell where he had to sleep on the floor at times and was not allowed to lock his cell when he was assigned one and the only precaution was that he was told to not discuss his charges.

Defendants provided no information regarding any measures taken to protect vulnerable inmates, they provided no explanation of Mr. Belanus's custody

classification or housing assignments, and there is no indication Defendants considered what charges the other inmates in Pod 1 may have had.

Although it is a closer question than with regard to Officers Merritt and Hawthorne, the Court will also deny Defendants West, Swain, Ferguson, Bulson, and Dutton's motion for summary judgment on this issue.

### b. Failure to Train

Despite Defendants' argument to the contrary, a supervisor's failure to train subordinates can give rise to individual liability under Section 1983 where the supervisor's failure amounts to deliberate indifference to the rights of persons with whom the employees are likely to come into contact. *Larez*, 946 F.2d at 646; *Canell v. Lightner*, 143 F.3d 1210, 1213–14 (9th Cir. 1998). In order to hold Defendants liable for failure to train and supervise under 42 U.S.C. § 1983, Mr. Belanus must establish that Defendants were "deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158-59 (9th Cir. 2014)(*citing Connick v. Thompson*, 563 U.S. 51, 58 (2011)). A plaintiff alleging a failure to train claim must show: (1) he was deprived of a constitutional right, (2) the defendant had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [his

employees] are likely to come into contact"; and (3) his constitutional injury would have been avoided had the defendant properly trained those employees. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007); *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).

Mr. Belanus alleges Defendants Ferguson, Bulson, Swain, West, and Dutton failed to train and supervise Officers Hawthorne, Shanks, Gilbertson, and Merritt. (Doc. 5 at 16-17.) Defendants only argument opposing this claim is that, "a failure to train claim cannot be against the named defendants because they do not have policy making authority." (Doc. 77 at 20.) They are incorrect.

Defendants cite *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986) for the following proposition:

> Liability under § 1983 attaches only when the decision maker possesses final authority to establish policy and only where a deliberate choice to follow a course of action is made from various alternatives by the officials responsible for establishing final policy with respect to the subject matter in question.

(MSJ Brief, Doc. 77 at 20 (emphasis added).) They then argue that because Sheriff Dutton was the only final policymaker, Defendants Ferguson, Bulson, Swain, and West cannot be held liable for failure to train. In fact, the United States Supreme Court held in *Pembaur* that:

> *municipal liability under § 1983* attaches where—and only where—a

31

deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Pembaur*, 475 U.S. at 483. *Pembauer* provides an analytical framework for municipal liability claims, it certainly does not foreclose supervisory liability claims based upon a failure to train.

As set forth above, a supervisory official can be held liable for a failure to train if they are on notice of the need to train and do not do so. *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (stating that § 1983 liability for deliberate indifference to medical needs may attach where "supervisors were on actual or constructive notice of the need to train." (*citing Farmer*, 511 U.S. at 841).)

Mr. Belanus asserts without evidence that Defendants West, Bulson, Ferguson and Swain are training officers. But Defendants do not dispute this assertion. Mr. Belanus contends these Defendants failed to properly train/supervise Defendants Merritt and Hawthorne on the handling of vulnerable inmates in general population. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate [such notice] for purposes of failure to train." *See Connick*, 563 U.S. at 62 (citation omitted); *see also Willard v. Cal. Dep't of Corrs. & Rehab.*, No. 1:14–cv–00760–BAM, 2015 WL 4495916, at *7 (E.D. Cal. July 23, 2015) (citing cases) (stating that the "cases

in which supervisors have been held liable under a failure to train/supervise theory involve conscious choices made with full knowledge that a problem existed"). Mr. Belanus only submitted evidence of one prior assault on a sex offender but as discussed, that is an outstanding discovery issue.

In filing a motion for summary judgment, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." *Oracle*, 627 F.3d at 387. Defendants presented no evidence or argument describing the training and/or supervision provided to Officers Merritt and Hawthorne regarding the protection and housing of vulnerable inmates such as Mr. Belanus. As such, these Defendants are not entitled to summary judgment on this issue.

Defendants did present evidence with regard to Mr. Belanus's claims that Defendants failed to train and supervise an unknown corporal on not disclosing inmates' charges to other inmates. (Counts VI, VII, VIII, Doc. 5 at 12-14.) There are several affidavits which indicate that "it is standard training for detention officers at LCDC that they do not discuss an inmate's charges or classification with another inmate." (Hawthorne Aff., Doc. 78-16 at 4, ¶ 17; see also Grimmis Aff., Doc. 78-17 at 3, ¶ 12; Dutton Aff., Doc. 78-18 at 2, ¶ 7; Swain Aff., Doc. 78-19 at 2, ¶ 6.) Mr. Belanus could not dispute this evidence and as such has not shown that the corporal did not receive sufficient training on this issue.

Moreover, Mr. Belanus's claims regarding what an unknown corporal may or may not have said are too speculative to go forward. Mr. Belanus cannot identify this individual and the only evidence he has of him discussing his charges is a handwritten note which would be inadmissible at trial to prove the truth of the matter asserted. Fed.R.Evid. 801, et. seq. He asserts that he observed the corporal talking with other detainees but he could not hear what they were talking about. Moreover, as Defendants point out, there are a number of ways that inmates at LCDC could have been made aware of Mr. Belanus's charges. For example, during the medication pass on July 11, 2009 just prior to the assault, Mr. Belanus told Officer Hawthorne that "a girlfriend of someone in Pod 2 had called the jail and found out why he was here." (SUF at ¶ 37.)

Accordingly, summary judgment will not be granted on Counts X and XI but it will be granted on Counts VI, VII, and VIII.

### c. Sheriff Dutton

In *Redman v. County of San Diego*, 942 F.2d 1435 (9th Cir. 1991) *abrogated on other grounds by Farmer*, 511 U.S. 825, the Ninth Circuit considered the acts of the Sheriff of San Diego County who was in charge of all the County's detention facilities. The Court found that the record showed that at the time of the assault on the plaintiff,

the South Bay Detention Facility housed over 300 detainees even though it was designed for 192, which is 56% over capacity. Officials at SBDF admitted that at any other facility, a detainee thought likely to assault others would be isolated or observed more carefully, but the overcrowding at SBDF meant that they "weren't able to do that." The facility was so crowded that cells designed for one person housed multiple inmates, and there was no individual housing, which made it impossible to isolate troublemakers like Clark. Thus, when Clark was found coercing sex from others in the homosexual unit, there was no way to isolate him. Instead, Clark was placed in the mainline population with the "hope that . . . nothing happens."

*Id.*, at 1447 (internal citations omitted). Based on this record, the Ninth Circuit found sufficient evidence of overcrowding, that the Sheriff should have known of the overcrowding, and that it was a moving force behind the rape of Mr. Redman.

Similarly, Mr. Belanus alleges Sheriff Dutton should be held liable for maintaining the facility beyond capacity thus forcing inmates who were previously segregated into general population. Mr. Belanus submitted evidence that LCDC had an average daily population of 77 in 2009 (Doc. 105-14 at 40) even though it was originally designed for 58 beds (Doc. 105-13). Although Defendants refused to admit that sex offenders had been segregated for their safety, Mr. Belanus contends that he was previously segregated for the majority of his incarceration at LCDC but that they moved him into general population due to overcrowding.

There is evidence in the record of both overcrowding and Sheriff Dutton's ultimate direction of operations at LCDC. Drawing all inferences in favor of Mr.

Belanus, the Court finds that a reasonable jury could find Sheriff Dutton was deliberately indifferent to Mr. Belanus's personal security rights by allowing overcrowding at LCDC. Moreover, a jury could find that Sheriff Dutton knew or reasonably should have known of the overcrowding at a facility under his administration and that he acquiesced in a deficient policy that was a moving force behind the assault on Mr. Belanus in violation of the Eighth Amendment. *See Redman*, 942 F.2d at 1447. Although the Court recognizes the challenges presented by overcrowding, there is no evidence that any additional precautions were taken to protect Mr. Belanus once he was placed in general population. Given the outstanding discovery issues and evidence presented in the record, the Court finds that Sheriff Dutton is not entitled to summary judgment.

### 3. Muncipal Liability

In Count IV, Mr. Belanus alleges that Lewis and Clark County is liable for maintaining an overcrowded jail which led to the assault on his person. (Doc. 5 at 10.) In Count XIV, he alleges the County had a practice of ignoring medical needs for several hours in order to keep medical costs down. (Doc. 5 at 20.)

Liability of governmental entities under 42 U.S.C. § 1983, "is limited to deprivations of federally protected rights caused by action taken 'pursuant to official municipal policy of some nature.' " *Pembaur v. City of Cincinnati*, 475

U.S. 469, 471 (1986) (*quoting Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). Because the theory of respondeat superior precludes a municipality itself from being held vicariously liable for the acts of its employees, the plaintiff must establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Thus, a local government unit such as the County, can only be held liable when County employees are found to have committed constitutional violations and "a policy, practice or custom of the entity can be shown to be a moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

### a. Overcrowding

Allegations of overcrowding, alone, are insufficient to state a claim under the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981); *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 471 (9th Cir. 1989); *Akao v. Shimoda*, 832 F.2d 119, 120 (9th Cir. 1987) (per curiam). Overcrowding may violate the constitution when it causes an increase in violence or reduces the availability of other constitutionally required services. *Balla*, 869 F.2d at 471; *Akao v. Shimoda*, 832 F.2d 119, 120 (9th Cir. 1987).

For reasons set forth above and for purposes of this motion, the Court will

37

assume that LCDC was overcrowded. There is evidence that LCDC was housing more inmates than it was designed to accommodate, Mr. Belanus was frequently moved to different pods due to overcrowding, and individuals were being housed in the library and on the floor of pods. (Movement Sheet, Doc. 78-3.)

Mr. Belanus argues that because LCDC was overcrowded he had to be placed in a general population pod as opposed to a segregated pod. Much like the individual claims, it is not just the placement of Mr. Belanus in general population that creates a problem. But there is no evidence that any additional precautions were taken for him as a sex offender once he was placed in a general population cell. As set forth above, Defendants provided no information regarding any measures taken to protect vulnerable inmates, they provided no explanation of Mr. Belanus's custody classification or housing assignments, and there is no indication Defendants considered what charges the other inmates in Pod 1 may have had, or the level of supervision in general population.

Defendants frame Mr. Belanus's overcrowding arguments as being a claim that LCDC instituted a policy to generate revenue by increasing the number of inmates. Mr. Belanus did make this argument (Doc. 5 at 10) but in that same claim he specifically alleges that the overcrowding at LCDC led to his placement in general population which resulted in the assault. (Doc. 5 at 10.) If the County

had a custom, policy or practice of placing more inmates in the detention center than it was designed to accommodate, without sufficient precautions being made for vulnerable inmates (such as sex offenders), then the County could be held liable. While there may not be an official written or adopted policy regarding overcrowding, there is sufficient evidence to create a genuine issue of material fact regarding whether overcrowding at the detention center is a custom which rises to the level of official policy.

Thus, there is a material issue of fact regarding whether Lewis and Clark County's failure to take action to address the overcrowding situation rose to the level of an official policy or custom, adopted with deliberate indifference to the likelihood of inmate on inmate assaults and which caused the assault on Mr. Belanus. At this point, there is not sufficient evidence to establish a pattern of incidents of inmate on inmate assaults particularly on sex offenders. But as discussed herein, there are outstanding discovery issues relevant to this issue. As such, summary judgment cannot be granted on the issue of municipal liability for Mr. Belanus's claims of failure to protect.

### b. Medical Needs

Mr. Belanus alleges Lewis and Clark County was deliberately indifferent to his serious medical needs because they have a practice of ignoring medical needs

for several hours to keep medical costs down. (Amd. Cmplt., Count XIV, Doc. 5 at 20.) To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (*citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. This second prong is met if the prisoner demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference. *Id.* Prison officials are deliberately indifferent if they deny, delay, or intentionally interfere with medical treatment. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

The Eighth Amendment duty to provide medical care applies to medical conditions that may result in pain and suffering which serve no legitimate penological purpose. *Estelle*, 429 U.S. at 103. "The infliction of unnecessary

suffering is inconsistent with contemporary standards of decency . . ." *Id.*

Under § 1983, "an individual may recover only when that individual's federal rights have been violated." *Quintanilla v. City of Downey*, 84 F.3d 353, 356 (9th Cir. 1996). As a result, when there is no underlying constitutional violation, a plaintiff cannot maintain a claim for municipal liability. *Id. (citing City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)(stating "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point").

Mr. Belanus failed to establish that any county employee was deliberately indifferent to his serious medical needs. The assault occurred at approximately 10:30 p.m. Emergency medical personnel arrived at 10:44 p.m. After a quick assessment, the EMTs determined Mr. Belanus did not need to be transported to the hospital. Staff initiated a call to the EMTS again at 12:03 a.m. to reexamine Mr. Belanus. They again determined that Mr. Belanus did not require emergency transport to the hospital. Despite this and because of Mr. Belanus's continuing complaints, a sheriff's deputy transported Mr. Belanus to St. Peter's Hospital at approximately 1:00 a.m. for further evaluation. (Merritt Report, Doc. 78-8 at ¶7.) St. Peter's Hospital staff diagnosed Mr. Belanus with multiple abrasions and

contusions, a mild kidney contusion, and a 2-cm laceration to his lower lip. Mr. Belanus was treated at the hospital and returned to LCDC at 5:44 a.m. (Id. at ¶ 9.)

Staff at LCDC appropriately relied upon the expertise of the EMTs and were not deliberately indifferent for doing so. When Mr. Belanus continued to be in pain, they transported him to the hospital. Despite his allegations that he was ignored for several hours, the record establishes that he was at the jail for just two and a half hours after the assault and before he was transported to the hospital and during that time he was examined twice by EMTs. There is no showing that any county employee was deliberately indifferent to his medical needs.

Mr. Belanus may have believed that he should have been transported to the hospital sooner but "a difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not [without more] amount to deliberate of indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds, Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014). To establish that such a difference of opinion amounted to deliberate indifference, a prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332

(9th Cir. 1996). The record does not demonstrate that there was a conscious disregard for Mr. Belanus's medical needs. Mr. Belanus has failed to establish that he suffered an underlying constitutional violation, therefore he cannot maintain a claim against the County for the policies which they may have established.

Summary judgment will be granted to the County on Mr. Belanus's deliberate indifference to serious medical needs claim.

## II. NON-DISPOSITIVE MOTIONS

### A. Motion for Protective Order (Doc. 70)

Mr. Belanus seeks an order to protect him from having to produce certain medical records. In their discovery requests, Defendants sought the following documents from Mr. Belanus:

> INTERROGATORY NO. 1: Please state with particularity the details of any physical or mental injuries you claim as a result of the incidents described in your complaint.

> INTERROGATORY NO. 2: Please identify any health care provider who has treated you for physical or mental injuries set forth in response to the preceding interrogatory.

> REQUEST FOR PRODUCTION NO. 1: Please provide copies of all office notes, medical/psychological tests, and medical/psychological reports generated since 2009 by the medical providers you listed in your Answer to Interrogatory No. 2 above. In the alternative, you may complete, sign, and return to MACO Defense Services the

enclosed Authorizations, one for each of your providers listed in your
Answer to Interrogatory No. 2 above, which will allow defense
counsel to obtain such documents directly.

(Doc. 80-1.)

Mr. Belanus placed his medical condition at issue in this case and it is
relevant to the remaining claims. As such, he must produce all medical records
related to his allegations in this case. If he has not already done so he must state
with particularity the details of any physical or mental injury he claims as a result
of the incidents at issue, all health care providers who have treated him for any of
these injuries, and provide all medical records regarding these injuries.

Should Mr. Belanus fail to comply, he will not be allowed to provide
evidence of the injuries he received and will not be allowed to seek damages for
any such injuries. The motion for protective order will be denied.

**B. Discovery Motions (Docs. 81, 85, 87, 89)**

Mr. Belanus's motion for sanctions and adverse jury instructions are all
based on alleged discovery violations. The motions will be denied.

**1. Sanctions and Instruction on Video Recordings (Docs. 81, 85)**

First, Mr. Belanus seeks sanctions and an adverse jury instruction arguing
that Defendants wrongfully destroyed video recordings of the July 11, 2009
incident, and the events prior thereto. However, Defendants demonstrated there

was no video surveillance of the infirmary or the individual cells in Pod 1, and the video monitors in the common area of Pod 1 were not recorded at the time of the incident thus there never was any recorded video footage of the fight or the trip to the infirmary. (Doc. 94 at 6 citing Ex. 3 at 2.) The motion for sanctions and motion for adverse jury instruction #1 will be denied.

### 2. Instruction on Video Policy (Doc. 87)

Second, Mr. Belanus seeks an adverse jury instruction based upon Defendants' alleged failure to provide a copy of the policy regarding LCDC's video surveillance system. Defendants presume Mr. Belanus is referring to the records retention and disposition schedule prepared by the local government records committee as set forth in Montana Code Annotated § 2-6-403(3) [repealed in 2015]. If this is the document Mr. Belanus is referring to, it is not a policy of the LCDC, but rather a proposed schedule prepared by a subcommittee of the state legislature. It has not been adopted as policy by the LCDC. (Grimmis Aff, Doc. 94-3 at 3, ¶ 6.) The schedule therefore is not responsive to Plaintiff's request for policies of the LCDC regarding the video surveillance system and is not a basis upon which to sanction Defendants or provide an adverse jury instruction. Moreover, there was no video to preserve and therefore the policy is irrelevant.

### 3. Instruction on Recorded Statement (Doc. 89)

Third, Mr. Belanus seeks an adverse jury instruction based upon Defendants' failure to retain Mr. Belanus's recorded statement taken by Captain Grimmis. (Doc. 90 at 2.) Mr. Belanus has not shown how this statement would be relevant when he can testify to the events at issue. In addition, a party is entitled to an adverse jury instruction, "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation…." Fed. R. Civ. Pro. 37(e)(2). It is undisputed that the electronic information at issue was lost because no affirmative steps were taken to secure a permanent copy. The information was automatically overwritten in the normal course of operations. This happened long before Defendants had notice of Mr. Belanus's lawsuit, and Defendants were not provided with timely notice that preservation was requested. Mr. Belanus thus cannot establish the intent to deprive, which is a necessary prerequisite to an adverse jury instruction.

### C. Motions to Compel (Doc. 83, 100)

Mr. Belanus moves to compel more extensive answers to almost every discovery request he propounded upon Defendants. It is impossible to determine the sufficiency of many discovery responses as Mr. Belanus only sought the production of documents and Defendants provided thousands of pages of

documents in response to those requests. Many of Mr. Belanus's requests sought documents pertaining to a nine-year period of time well after the incident at issue and when Mr. Belanus was not incarcerated at LCDC. The Court agrees that information requested about LCDC after July 11, 2009 is not relevant and need not be produced. Without reviewing all of the documents produced, it is impossible to determine if the documents produced were responsive to Mr. Belanus's requests.

The Court has reviewed the discovery motions in detail along with the discovery responses and the parties' briefings and provides the following analysis.

### 1. Items not in Defendants' Possession

Defendants are only required to produce items in their "possession, custody, or control." Fed.R.Civ.P. 34(a)(1). A party is not required to create items to disclose in discovery. Rule 34 of the Federal Rules of Civil Procedure only requires a party to produce documents that already exist. *See Alexander v. FBI*, 194 F.R.D. 305, 310 (D.D.C.2000). A party responding to a Rule 34 document request cannot be compelled to prepare or create new documents. *Ibid.; see also Paramount Pictures Corp. v. Replay TV*, No. CV 01–9358 FMC (Ex), 2002 WL 32151632, at *2 (C.D.Cal.2002) (*citing Alexander*, 194 F.R.D. at 310). The rules of discovery do not require a party to create or generate responsive materials (in this case, photographs) but only to produce and allow inspection of "items in the

responding parties' possession, custody, or control." *Seed Research Equipment Solutions, LLC v. Gary W. Clem, Inc.*2011 WL 3880895 (D.Kan 2011). Because the Court has no authority to require Defendants to create items that a party does not have in its possession, custody or control, Mr. Belanus's motion with regard to all documents that Defendants represent they do not have in their possession, custody or control will be denied.

Mr. Belanus cites to *Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980) for the proposition that he was entitled to photographs of all staff at LCDC in order to properly name John Doe defendants. The Court does not agree. Mr. Belanus was given an opportunity to conduct discovery on John Doe defendants. He could have sent interrogatories regarding the officers on staff in the days leading up to the assault or he could have asked for the name of the officer that attended his criminal proceedings. But instead, Mr. Belanus asked for improper discovery when he requested that Defendants take photos of all staff and provide their names and other information. Defendants responded to Mr. Belanus's requests for photographs by stating that they do not have photographs of their employees. They will not be required to take and produce photographs that do not otherwise exist.

In RPD 10, Mr. Belanus seeks all video footage from LCDC from August 3,

2008 to August 13, 2008. Defendants responded that the requested information was not in Defendants' possession. Mr. Belanus in many of his filings contends that there was video evidence of his pod on July 11, 2009. But Defendants have provided undisputed testimony from Captain Grimmis that,

> Prior to 2010 the only areas of the jail which were monitored by camera were the booking floor, the DUI processing hallway and the dayroom of each pod in the jail. None of those cameras were routinely recorded. The booking floor and DUI processing areas were only recorded during DUI processing or when an officer felt the need to document something happening in that area. In those events an officer could record footage from cameras in those areas were [sic] onto a VHS tape. The video monitors in the dayrooms were not capable of being recorded, but were only used by the control room officer to visually monitor activities in the dayrooms.

(Grimmis Aff., Doc. 94-3 at 2, ¶ 3.) Mr. Belanus disputes this statement but he provides no evidence to contradict it. There is no evidence that video of the incident at issue ever existed.

In his addendum to discovery request 1, Mr. Belanus requests transcripts of the court proceedings for the inmates convicted of his assault. Defendants responded that they do not have these documents in their possession. Mr. Belanus argues they are obligated to obtain these documents. They are not.

Mr. Belanus also requested the audio interview of Inmate Olson which Defendants indicate was overwritten. Defendants cannot produce something

which no longer exists.

## 2. Sufficient Responses

Mr. Belanus requested photographs of all inmates from August 3, 2008 to August 13, 2009. In response, Defendants provided the photographs of all individuals in Pod 1 and Pod 2 with their names on July 11, 2009. The Court finds this response to be sufficient.

In requests 3-5, Mr. Belanus asks for the maximum and actual capacity of LCDC. He was informed that there is no maximum capacity but LCDC was originally designed to hold 54 individuals. He was also provided the names and dates of individuals housed in each pod. The Court finds these responses to be sufficient.

Mr. Belanus complains he was not provided with policies and procedures for staff duties or recording of videos. Defendants provided LCDC's policies and procedures but withheld policies regarding detention center security. The Court agrees those policies are confidential and need not be produced to Mr. Belanus. However, Defendants will not be allowed to utilize at trial any policy or procedure that was not produced in discovery.

In RPD 12, Mr. Belanus requested all records which authorized, recorded, documented, and tracked the movements of Mr. Belanus and other segregated

individuals from August 3, 2008 to August 13, 2009. In response, Defendants indicated they provided Mr. Belanus with all responsive documents with their disclosures which consisted of 713 pages. Mr. Belanus argues the information was not provided. Mr. Belanus argues that he needs to know the names of the administrators who authorized his move to general population but that is not what he requested in discovery. He requested documents and was provided those documents. Although he argues the information was not provided, he points to no documents which have not been produced. Defendants' response is sufficient.

### 3. Discovery to be Provided

In RPD 8, Mr. Belanus sought all documents concerning any misconduct by any employee of LCDC from August 3, 2007 through April 11, 2016. Defendants objected on the grounds that the request was overbroad in that it sought disciplinary records for all LCDC employees for a nine-year period of time, most of which was after the events at issue. The Court agrees the original request is overbroad, however, Defendants will be required to produce all records regarding and concerning any alleged misconduct by Officers Merritt and Hawthorne related to failure to protect inmates from August 3, 2007 to July 11, 2009.

In RPD 9, Mr. Belanus sought records regarding all assaults, fights, incidents, segregations at LCDC from August 2007 to April 11, 2016. Defendants

objected to this request on the grounds that it was overbroad. Mr. Belanus argues that he cannot provide evidence of the repeated history of assaults at LCDC without this evidence and he invokes Rule 56(d). (Doc. 105 at 3.) Defendants argued in their motion for summary judgment that a single prior assault was not sufficient evidence to impose liability for a failure to implement procedures to prevent such assaults. Defendants cannot refuse to produce discovery on prior assaults then argue Mr. Belanus failed to meet his burden because he did not have the evidence. If there were assaults on sex offenders at LCDC prior to July 11, 2009, it is relevant to Mr. Belanus's supervisory and municipal liability claims. Defendants will be required to produce all records of prior assaults on sex offenders at LCDC from August 2007 to July 11, 2009.

In RPD 14, Mr. Belanus sought all documents regarding managing prisoners who threatened violence at the LCDC, including documents regarding actual assaults. Defendants referred Mr. Belanus to the LCDC policies and procedures and referred to their response to RPD 9. Again, Defendants have produced a number of policies and procedures which the Court finds sufficient but Defendants will not be allowed to refer to any other documents regarding policies which have not been produced in discovery. In addition, as set forth above, Defendants will be required to produce all records of prior assaults on sex offenders at LCDC from

August 2007 to July 11, 2009.

In RPD 15, Mr. Belanus sought all records, policies, internal operating procedures, guidelines, internal communications, rules, and/or any information regarding the operations of any internal investigatory or review division which inquires or investigates the misconduct and/or conduct of any employed person at LCDC and Lewis and Clark Sheriff s Office from August 3rd (sic), 2007 until and including the date of this request. Defendants objected to this request on the grounds that it was overbroad, overly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence and was designed to harass Defendants. If there was an internal investigation or review division which investigated any LCDC employee's conduct as a result of the July 11, 2009 incident at issue, those documents must be produced.

### 4. Cumulative Requests

Mr. Belanus's interrogatories were cumulative to the requests for production of documents. The Court has addressed those issues above.

### D. Motion for Contempt of Court Order or Compel Compliance

Mr. Belanus subpoenaed documents from Cherry Creek Radio regarding all broadcasts dealing with Sheriff Dutton, LCDC and the Lewis and Clark County Sheriff's Office. The subpoena was signed by the Clerk's Office on July 22, 2016

(Doc. 103-1) and served on Cherry Creek Radio on August 22, 2016 (Doc. 103-2).

Mr. Belanus filed his motion for contempt on October 4, 2016. (Doc. 101.) On October 6, 2016 Chris Ackerman, on behalf of Cherry Creek Radio responded to the subpoena by letter informing Mr. Belanus that Cherry Creek Radio did not keep records of broadcasts, had no knowledge of the subject matter, has no recollection of Sheriff Dutton being in the station, and has no knowledge of the statements which Mr. Belanus referenced in his subpoena. (Doc. 103 at 2; 103-3; 103-4.)

Non-parties Chris Ackerman and Ron Davis filed a response to Mr. Belanus's motion on October 12, 2016 asking that it be denied as moot. (Doc. 103.) Mr. Belanus has no evidence to contradict Cherry Creek's response to the subpoena. The motion will be denied.

### E. Motion for Declaratory Judgment (Doc. 114)

The motions' deadline in this matter was July 22, 2016. Mr. Belanus's motion was filed on November 4, 2016 and it is therefore untimely. In addition, the relief sought in the motion is unrelated to the issues in his lawsuit. In fact, Mr. Belanus is raising a completely new issue. This matter is proceeding on Mr. Belanus's claims that Defendants failed to protect him from an attack by other inmates and thereafter denied him medical care. In his current motion, Mr.

Belanus seeks a declaratory judgment declaring that his initial appearance which was held without counsel was a critical stage of his criminal proceedings and that the setting of his high cash bond and the increase of his case bond without hearing was a violation of the Eighth and Fourteenth Amendments regarding Montana's constitutional and statutory guarantees.

The Court lacks authority to issue an injunction for such relief. *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). The Ninth Circuit has explained:

> [T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint. This requires a sufficient nexus between the claims raised in a motion for injunctive relief and the claims set forth in the underlying complaint itself. The relationship between the preliminary injunction and the underlying complaint is sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally.' Absent that relationship or nexus, the district court lacks authority to grant the relief requested.

*Pac. Radiation Oncology*, 810 F.3d at 636.

Accordingly, the motion will be denied.

Based upon the foregoing, the Court issues the following:

## ORDER

1. Mr. Belanus's Motion for Protective Order (Doc. 70) is DENIED.

Within 30 days of the date of this Order, Mr. Belanus must, if he has not already

done so, produce all medical records related to his allegations in this case. He must state with particularity the details of any physical or mental injury he claims as a result of the incidents at issue, all health care providers who have treated him for any of these injuries, and he must provide all medical records regarding these injuries.

2. Defendants' Motion for Summary Judgment (Doc. 76) is GRANTED as to Count VI (failure to train corporal), Count VII (failure to train corporal), Count VIII (failure to train corporal), Count XII (failure to investigate), and Count XIV (denial of medical care). Defendants Grimmis, Shanks, and Gilbertson are DISMISSED.

Defendants' Motion for Summary Judgment is DENIED as to Counts I, II, IV, IX, X, XI, XIV, and XVII and as to Defendants Hawthrone, Merritt, Dutton, West, Bulson, Ferguson, and Swain.[3]

3. Mr. Belanus's Motion for Sanctions (Doc. 81) is DENIED.

4. Mr. Belanus's Motions to Compel (Doc. 83, 100) are DENIED IN PART AND GRANTED IN PART. Defendants will be required to produce:

  a. All records regarding and concerning any alleged misconduct by

---

[3]Counts III, V, XIII, XV, XVI, XVIII, and XIX were previously dismissed and/or name only defendants who have not been served and are not parties to this action.

Officers Merritt and Hawthorne related to failure to protect inmates from August 3, 2007 to July 11, 2009;

      b. All records of prior assaults on sex offenders at LCDC from August 2007 to July 11, 2009; and

      c. any records pertaining to any internal investigation or review division which investigated any employees' conduct as a result of the July 11, 2009 incident at issue.

The motions to compel are DENIED with regard to all other discovery requests.

5. Mr. Belanus's Motions for Adverse Jury Instructions (Docs. 85, 87, 89) are DENIED.

6. Mr. Belanus's Motion for Contempt or to Comply Compliance (Doc. 101) is DENIED.

7. Mr. Belanus's Motion for Declaratory Judgment (Doc. 114) is DENIED.

DATED this 23rd day of March, 2017.

Dana L. Christensen, Chief Judge
United States District Court